UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

AVMED, INC.,

      Plaintiff,                         Case No.: 1:20-cv-21838-RNS

vs.

TRANSACTION APPLICATIONS
GROUP, INC. a/k/a NTT DATA
SERVICES, LLC,

      Defendant.

_____/

**PLAINTIFF'S EXPEDITED MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff, AvMed, Inc. ("AvMed"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 65(a) and Local Rule 7.1(d), hereby moves this Court for its expedited consideration by no later than May 12, 2020 of AvMed's request for the entry of a preliminary injunction requiring Transaction Applications Group, Inc., a/k/a NTT Data Services, LLC ("Defendant" and/or "NTT") to continue performing in accordance with its agreement, and states as follows:

**I. Preliminary Statement**

AvMed entered into a Master Services Agreement and Scope of Work #1-2018[1] (collectively, the "MSA") with NTT to facilitate a total transformation of AvMed's use of information technology. The project, called "Operation Transformation," was necessary because AvMed's existing enterprise systems were becoming unsupported and obsolete and unable to perform the functions and processes integral to AvMed's business.  Operation Transformation would fundamentally improve and upgrade AvMed's delivery and operation of its business and

---

[1] Due to confidentiality concerns, the MSA has not been attached to the Complaint filed by AvMed or this Expedited Motion. However, AvMed is willing and able to provide the Court with a copy of the MSA and all related schedules in advance of any hearing on this Expedited Motion if so required by the Court.

serve as the linchpin ensuring AvMed's survival. The scope of work to be performed and taken on by NTT was immense and touched every one of AvMed's lines of business.

However, everything has not gone according to plan due to substantial delays in NTT's performance under the MSA. The date when AvMed anticipated it would "go live" on its new systems has been repeatedly pushed back, resulting in AvMed incurring substantial costs to maintain its current obsolete systems. The current "go live" date is July 1, 2020, which AvMed has been relying on in making key operational decisions for its short-term and long-term business objectives and overall survivability. Up until April of 2020, AvMed had no reason to believe NTT would be unable to make the July 1, 2020 "go live" date.

Now, on the proverbial eve of the "go live" date, NTT informed AvMed it was stopping work on several critical initiatives necessary for a fully functioning enterprise system. NTT claims it is owed additional money outside of what is contemplated in the MSA because the items it is ceasing work on were more expensive than anticipated or outside the scope of the MSA. However, as explained in detail *infra*, these critical initiatives are clearly within the scope of the MSA. Moreover, despite already performing substantial work on these critical initiatives before its abrupt halt, NTT never followed the appropriate change order procedures in the MSA to obtain authorization for additional payment, reflecting that this work is within the existing scope of the MSA. Instead, NTT sought to financially extort AvMed by stopping work for a number of days.

AvMed informed NTT on Sunday, May 3, 2020, that it filed a Complaint against NTT and would be seeking emergency injunctive relief to require NTT to resume working. In response, NTT agreed to send its employees back to work at 9:00 a.m. on May 4, 2020, temporarily addressing the need for emergency relief. However, NTT has only committed to resuming work for two weeks, meaning NTT will once again stop working on critical initiatives no later than May

2

15, 2020. However, any further delays from NTT will result in NTT failing to meet the "go live" date. If that occurs, AvMed will suffer substantial damages that will not be compensable through money damages alone. For the reasons stated more thoroughly below, AvMed respectfully requests the Court grant AvMed's Expedited Motion in order to preserve the status quo and prevent NTT from continuing to threaten irreparable harm to AvMed as a bad faith negotiating tactic.

## II.  Factual and Procedural History

### A.    AvMed's Need for Enterprise Systems and Information Technology Services

In early 2018, AvMed decided that it was necessary to transform its entire enterprise systems and information technology, as its existing systems had significant limitations and posed compliance concerns (the "Transformation Services"). (Declaration of Winston Lonsdale (the "Lonsdale Decl.") at ¶ 8). Specifically, several of AvMed's systems and technology were about to become unsupported and sunset, which means AvMed would be unable to provide high-level member services and would be required to expend significant costs relating to adjudication of claims due to system limitations. (*Id.*). The scope of the Transformation Services AvMed required is immense and multi-disciplinary. (*Id.*). It encompasses and substantially impacts every line of business at AvMed and would revolutionize the way AvMed operates, and is mission critical to AvMed's survivability, growth initiatives and future forecasts. (*Id.*).

AvMed also decided in early 2018 that it was necessary to contract certain business process outsourcing (BPO) services so that the operations and responsibilities for several of its business process could be contracted to a third-party service provider (the "Transition Services"). (*Id.* at ¶ 9). The areas that AvMed determined must be outsourced included IT applications and infrastructure, and certain front office and back office operations. (*Id.*). These operations handle,

among other things, the provider call center, claims operations, enrollment and premium services, applications configuration, support services, and provider data management. (*Id.*).

## B.     Negotiations with NTT and Formation of the MSA

AvMed selected NTT to provide Transformation Services and Transition Services, which was necessary for AvMed's survivability. (*Id.* at ¶ 10). NTT expressed interest in providing both the Transformation Services and Transition Services work that needed to be performed. (*Id.* at ¶ 11). However, prior to submitting its proposal, NTT claimed it needed substantial due diligence in order to understand, among other things, AvMed's existing systems and their limitations, how these systems could be transformed into industry standard systems, and what the scope of the Transformation Services and Transition Services would entail. (*Id.*).  NTT requested it be provided approximately $1,000,000 to conduct its due diligence, which AvMed agreed to pay. (*Id.*).

NTT conducted invasive and thorough due diligence into AvMed's existing enterprise systems and information technology. (*Id.* at ¶ 12). This included having scores of NTT representatives on site at AvMed's facilities for nearly nine months. (*Id.*). AvMed provided NTT access to everything NTT asked for during the due diligence process that was available to AvMed, including without limitation its employees, systems, servers, and operations. (*Id.*).

After conducting its extensive due diligence, NTT made a proposal to AvMed to perform the Transformation Services and Transition Services. (*Id.* at ¶ 13). The proposal was heavily negotiated between AvMed and NTT. (*Id.*). NTT agreed to a scope of work that included completion of the seven (7) high-level initiatives in Schedule W of the SOW, which was further detailed in a "Detailed Transformation Plan" that was incorporated by reference into Schedule W. (*Id.* at ¶ 14). NTT was also required to implement the necessary customizations needed to integrate AvMed's information technology in such a way that made it a fully functional solution in line with

4

AvMed's expectations. (*Id.*). NTT was also broadly required to provide a fully functional solution that is typical for customers like AvMed in the health plan provider industry. (*Id.*).

### C.      Evolution of the Project's "Go Live" Date

Per Schedule W, NTT was originally obligated to "go live" with various Transformation Services starting in July 2019. (*Id.* at ¶ 15). Schedule W contemplated all transformation initiatives, including transition services following the implementation of the initiatives, being completed within eighteen (18) months of the MSA being executed—i.e., by March 2020. (*Id.*). However, NTT has repeatedly come to AvMed and the members of the steering committee with news that it would be unable to perform and meet its obligations as required under the MSA within the agreed upon timeframes. (*Id.* at ¶ 16).   The repeated delays, caused by NTT's mismanagement of the project, resulted in NTT abandoning the staggered "go live" dates set forth in the MSA and instead moving to a single date: July 1, 2020.  (*Id.* at ¶ 17).

### D.      NTT's Demand for Additional, Extra-Contractual Payment

Toward the end of 2019, the Parties began having discussions over NTT's desire to be paid more for its work. (Lonsdale Decl. at ¶ 20). The parties had numerous discussions over these concerns but NTT never submitted a change request for any additional work to be authorized. (*Id.*).

On March 3, 2020, Chris Stidvent, Vice President, Commercial Litigation for NTT sent AvMed a letter providing notice under Section 19.2 of the MSA that a dispute exists between the parties and made a demand for $16,851,140 in additional, extra-contractual payment. (*Id.* at ¶ 21). On March 6, 2020, Mr. Stidvent and Christina Schwing, counsel for AvMed, had a discussion involving the demand for payment, but Mr. Stidvent was unable to explain what work the demand related to, whether that work was anticipated future work or why NTT contends it was not within the scope of the MSA. (*Id.* at ¶¶ 22-23). He advised that he was going to reach out to the NTT

working teams to get more information, but understood the need for clarity and promised to provide AvMed a "position paper" which responded to these basic questions surrounding the dispute. (*Id.* at ¶ 23). NTT failed to provide the promised position paper or anything that shed light over the details surrounding the dispute. (*Id.* at ¶ 24).

### E.     AvMed's Efforts to Resolve NTT's Demand

On March 17, 2020, Glenn Weiner, an attorney with Klehr Harrison Harvey Branzburg, LLP, called Ms. Schwing advising that he was representing NTT concerning the dispute with AvMed. (*Id.* at ¶ 25).  Ms. Schwing advised Mr. Weiner of the conversation that she had previously with Mr. Stidvent and again explained the need for AvMed to get the position paper so that the parties could have a meaningful discussion surrounding the dispute. (*Id.*). Counsel for the parties continued to discuss potential resolution, including scheduling a mediation for May 20, 2020 per the terms of the MSA. (*Id.* at ¶¶ 26-32).

### F.     NTT's Breach and Refusal to Continue Work

On April 7, 2020, Vijay Jagannathan, the Client Executive appointed by NTT per the terms of the MSA, called AvMed's Chief Information Officer, Winston Lonsdale, and threatened that NTT was going to refuse to continue working on certain Transformation Services because of the dispute that was arising between the parties. (*Id.* at ¶ 33). Mr. Jagannathan also informed Mr. Lonsdale that if NTT continued to stop work, NTT would not be able to meet the "go live" date of July 1, 2020. (*Id.*). On April 10, 2020, Shashi Yadiki, NTT's President, confirmed with Jim Repp, AvMed's President, that NTT was planning to stop work on certain initiatives and that if it did so, NTT would not be able to meet the critical "go live" date of July 1, 2020. (*Id.* at ¶ 34).

The next day on April 11, 2020, AvMed, through counsel, sent NTT a letter outlining NTT's breach of the MSA by refusing to continue working on certain initiatives. A copy of

AvMed's April 11, 2020 correspondence is attached to the Lonsdale Decl. as Exhibit A. Counsel for AvMed also called Mr. Weiner before sending the letter to advise him of the threats made by his client and to again follow up on why NTT still had not provided the information about the dispute so the parties could have meaningful discussions. (Lonsdale Decl. at ¶ 35).

On April 15, 2020, counsel for NTT confirmed that NTT will not perform work for five initiatives that are not yet completed and are critical to AvMed meeting the go-live date: (i) loading all provider contracts into the HealthRules program; (ii) vendor partner integration into a program called Dell Boomi; (iii) completion of the integrated data stores ("IDS"); (iv) construction of a new enterprise data warehouse ("EDW"); and (v) remediation of existing applications used by AvMed (collectively, the "Stop Work Items"). (*Id.* at ¶ 38). Later on the night of April 15, 2020, NTT's counsel finally sent the position paper NTT had been promising since early March but failed to provide much of the needed and promised information (the "Dispute Notice"). (*Id.* at ¶ 37). The position paper advised that NTT demands $16,851,010 for 1) work that still needs to be completed for the Stop Work Items which NTT would refuse to complete, and 2) work that NTT has already completed but failed to follow the Change Control Procedures to obtain an executed change request authorizing payment. (*Id.*).

The Stop Work Items are critical to the implementation of the Transformation Services contracted for by AvMed in the MSA. (*Id.* at ¶ 39). Specifically, each of these items must be completed before AvMed can "go live" on July 1, 2020, as they are necessary for a fully integrated enterprise system to operate. (*See id.* (detailing the technical reasons the Stop Work Items must be completed in order for AvMed to "go live")).

On April 30, 2020, counsel for AvMed sent NTT two additional letters responding to NTT's position about refusing to perform work on the Stop Work Items. A copy of AvMed's

April 30, 2020 correspondence regarding stopping work is attached to the Lonsdale Decl. as Exhibit B and a copy of AvMed's April 30, 2020 correspondence responding to the Dispute Notice is attached to the Lonsdale Decl. as Exhibit C. As explained in AvMed's April 30, 2020 letters, NTT does not have a basis to refuse to perform work within the scope of the MSA and that the work set forth in the Stop Work Items all falls within the scope of the MSA. *Id.*

NTT has never followed the Change Control Procedures set forth in the MSA to request approval to be paid additional money than the $2.8 million it is already being paid each month pursuant to the MSA for any of the Stop Work Items, which is indicative of the fact that such work falls within the scope of the MSA. (*Id.* at ¶¶ 42, 51). Based on the MSA, AvMed is not obligated to pay additional money for work that already falls within the scope of the MSA. (*Id.*). Additionally, the MSA provides that the Parties shall comply with the Change Control Procedures set forth in Schedule 2 of the MSA in making any changes and that the parties are only bound by fully executed statements of work. (*Id.* at ¶ 43).

Despite threats by NTT to stop performing work on the Stop Work Items, NTT appeared to be continuing to meet most of its obligations under the MSA. (*Id.* at ¶ 44). However, on April 27, 2020, AvMed learned that NTT executives had communicated to their working teams to stop work on the Stop Work Items and started to see evidence that NTT had in fact stopped work. (*Id.*). On April 30, 2020, Mr. Yadiki again spoke with Mr. Repp and reiterated NTT was stopping work and would be unable to meet the "go live" date if it did not immediately resume. (Declaration of James Repp (the "Repp Decl.") at ¶ 8).

On May 3, 2020, the undersigned spoke with Mr. Weiner, counsel for NTT, and notified him of the filing of the Complaint and an impending Emergency Motion for Preliminary Injunction to require NTT to resume working. Mr. Weiner advised that NTT would agree to go back to work

for two weeks while the parties continued to negotiate NTT's demand for additional payment. However, following the two weeks of resumed work, NTT would once again refuse to continue working on the Stop Work Items if an agreement is not reached. This is yet another anticipatory breach of the MSA, as NTT cannot unilaterally decide to flip a switch and cease working on the Stop Work Items while a dispute is pending. MSA at § 14.5. Due to NTT's conduct to date, AvMed cannot be assured that NTT will continue performing under the MSA through the "go live" date and requires expedited intervention from the Court prior to NTT's latest threat coming to fruition, as AvMed will suffer irreparable harm because NTT's conduct jeopardizes the "go live" date.

### III.  <u>Legal Standard</u>

To prevail on a motion for a preliminary injunction, AvMed must establish four elements: (1) there is a substantial likelihood of success on the merits of the claims; (2) the plaintiff will suffer irreparable harm in the absence of injunctive relief; (3) the threatened injury to the plaintiff outweighs any potential harm to the defendant as a result of the injunction; and (4) granting the injunction would not be adverse to the public interest.  *See Schiavo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Bulova Corp. v. Bulova Do Brasil Com. Rep. Imp. & Exp. Ltda.*, 144 F. Supp. 2d 1329, 1331 (S.D. Fla. 2001).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*,451 U.S. 390, 395 (1981).  Due to the time constraints often associated with the need for preliminary relief, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial." *Id.* (reasoning that a movant "is not required to prove his case in full at a preliminary-injunction hearing.")

### IV.  <u>Argument</u>

#74390835_v2

AvMed seeks expedited injunctive relief requiring NTT to specifically perform under the parties' MSA.[2] Specifically, NTT should be required by this Court to continue working on the Stop Work Items in order for NTT to comply with the July 1, 2020 "go live" date. AvMed meets all of the requirements for an expedited preliminary injunction, as detailed below:

**A.      AvMed Has a Strong Likelihood of Success on the Merits of its Claims.**

AvMed has asserted three causes of action against NTT: (1) specific performance; (2) injunctive relief; and (3) breach of contract. Of specific importance to this Expedited Motion are the specific performance and breach of contract claims (counts I and III). AvMed has a strong likelihood of success on the merits of these claims.

1. <u>Specific Performance (Count I)</u>

Count I of AvMed's Complaint includes a claim for specific performance. The burden AvMed must carry to obtain specific performance is similar to the burden it bears to obtain preliminary relief. *Burger Chef Systems, Inc. v. Burger Chef of Florida, Inc*., 317 So. 2d 795 (Fla. 4th DCA 1975) ("injunction against breach of contracts, or the enforcement of negative covenants in contracts by injunction against their breach, may result in specific performance of the contract."). Under Florida law, specific performance "requires a plaintiff to plead: (1) they are clearly entitled to specific performance; (2) there is no adequate remedy at law; and (3) justice must require it." *Parkway Baptist Church, Inc. v. Guideone Elite Ins. Co.*, 10-23965-CV, 2011 WL 13099891, at *3 (S.D. Fla. Sept. 21, 2011).

First, AvMed is entitled to specific performance under its MSA with NTT. The MSA requires NTT to complete the Transformation Services, which include the Stop Work Items, by

---

[2] Specific performance is an appropriate remedy that can be ordered in connection with a motion for preliminary injunction. *Travelers Cas. and Sur. Co. of America v. Industrial Commercial Structures, Inc.*, No. 6:12–cv–1294, 2012 WL 4792906, at * 2 (M.D. Fla. Oct. 9, 2012) (granting in part a motion for preliminary injunction seeking specific performance of a contract); *Invego Auto Parts, Inc. v. Rodriguez*, 34 So.3d 103, 104 (Fla. 3d DCA 2010).

the already delayed "go live" date of July 1, 2020. MSA at Schedule W. Moreover, NTT cannot unilaterally decide to stop working on the Stop Work Items without following the Change Control Procedures, which NTT has not done. MSA at § 14.5. AvMed has and will continue to be ready, willing, and able to perform as required under the MSA, thereby entitling AvMed to reciprocal specific performance as a matter of equity and fundamental fairness.  Indeed, AvMed continues to pay NTT approximately $2.8 million each month to obtain a transformed enterprise system by July 1, 2020 per the MSA.   (Lonsdale Decl at ¶ 51).

Second, there is no adequate remedy at law that can be substituted for specific performance. If AvMed is unable to "go live" on July 1, 2020, there will be substantial non-economic and impossible-to-value harms to its reputation and goodwill. (*See, generally,* Repp Decl.). AvMed is highly localized, as it only operates in certain counties within Florida. (*Id*. at ¶ 11). Therefore, AvMed is particularly sensitive and reliant on its reputation and goodwill in working with Floridians and companies operating in AvMed's service area to survive. (*Id*.). AvMed will also suffer substantial monetary harm that cannot be remedied at law. Though AvMed's economic harm can potentially be identifiable and quantified, it is irreparable as a matter of law due to the damages limitations and caps in the MSA and would be fatal to several of AvMed's lines of business. For a more detailed analysis of AvMed's irreparable economic harm, *see* Section IV(B), *infra.*

Third, justice and the public interest require specific performance in this case. Performance is not impossible; NTT has just unreasonably refused to perform out of a mistaken belief that AvMed should bear the cost of NTT's mismanagement or underbidding of the Transformation Services. To allow NTT to repudiate partial performance under the MSA that is critical to the overall functionality of the enterprise system AvMed contracted for based on nothing more than greed and coercion would be the definition of injustice. Instead, the Court should find AvMed is

11

entitled to specific performance because justice requires the enforcement of valid contracts. *Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc.*, No. 09–21678–CIV, 2009 WL 3831437, at *2 (S.D. Fla. Nov. 16, 2009).

### 2. Breach of Contract

Count III of AvMed's Complaint alleges a cause of action for breach of contract. The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *Abbott Laboratories, Inc. v. General Electric Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000). In this case, the MSA is unquestionably a valid contract and AvMed has and will continue to suffer damages as a result of NTT's conduct. *See* Section IV(B), *infra*. Therefore, all that remains is the element of breach.

AvMed's claim is premised on three theories of breach: (i) anticipatory repudiation; (ii) NTT stopping work when not contractually allowed to do so; and (iii) NTT breaching the express and implied covenant of good faith and fair dealing.

### i. *Anticipatory Repudiation*

"Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach." *Hosp. Mortg. Group v. First Prudential Dev. Corp.*, 411 So.2d 181, 182 (Fla. 1982). Here, NTT was obligated to complete the necessary Transformation Services no later than July 1, 2020. NTT has unequivocally told AvMed at the highest level it has no intention to perform, despite the ability to do so. (Repp Decl. at ¶ 8). Even by agreeing to resume work for two weeks, NTT would not be able to "go live" by July 1, 2020 if it ceases working again after May 15, 2020. AvMed has always and will remain ready, willing, and able to perform under the MSA and continues to pay NTT for services it has not received.

(Lonsdale Decl. at ¶ 51). Therefore, AvMed is likely to establish NTT has anticipatorily breached the MSA by refusing to continue work on the Stop Work Items after May 15, 2020, which in turn will prevent NTT from timely delivering a fully functioning enterprise system.

### ii.   *NTT Stopping Work in Violation of the MSA*

Pursuant to § 14.5 of the MSA, NTT is not excused from performing the Stop Work Items because it did not use commercially reasonable efforts to mitigate the impact of its failure to perform and did not follow the Change Control Procedures outlined in Schedule 2 of the MSA. By unilaterally deciding to discontinue work on the Stop Work Items, NTT breached the MSA and has and will continue to cause AvMed substantial damage. *See* Section IV(B), *infra.* Therefore, AvMed is likely to succeed on its breach of contract claim against NTT premised on NTT's refusal to continue working on the Stop Work Items.

### iii.   *Covenant of Good Faith and Fair Dealing*

Under the MSA, NTT had an obligation to act in good faith and fair dealing. MSA § 24.15. Moreover, all Florida contracts have an implied covenant of good faith and fair dealing. *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1184 (Fla. 2d DCA 2000). NTT's actions are the antithesis of good faith. Rather than follow agreed upon procedures for requesting and, if necessary, disputing changes to the parties' agreement, NTT is holding AvMed hostage by refusing to continue work on the Stop Work Items and thereby jeopardizing the "go live" date. NTT is only using the "go live" date as a means to extort AvMed into paying additional money for services it already contracted for, stopping and starting work at will as a negotiation tactic. AvMed is therefore clearly likely to prevail on its breach of the covenant of good faith and fair dealing claim.

**B.    AvMed Will Suffer Irreparable Harm if it is Not Granted Preliminary Injunctive Relief.**

Harm is considered irreparable only if it cannot be undone through monetary remedies. *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 2001). However, in order to be reparable through monetary remedies, the money damages must be recoverable. *Phillip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1303 (2010). Irreparable harm "must be neither remote nor speculative, but actual and imminent." *Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)).

The damages AvMed will incur if an injunction is not entered in this case falls squarely within the type of irreparable harm that justifies preliminary relief. Specifically, AvMed will suffer substantial reputational harm and loss of goodwill if it is unable to "go live" on its new enterprise system by July 1, 2020. (Repp Decl. at ¶ 11). This includes AvMed's reputation with numerous large corporate clients that are expecting AvMed to be able to deliver new lines of business and product options shortly following the July 1, 2020 "go live" date. (Repp Decl. at ¶ 23) AvMed is also involved in a project with a highly visible and influential local business association (the "Business Association") that requires AvMed to have access to its enterprise system no later than July 1, 2020. (Repp Decl. at ¶¶ 25-29.) If AvMed is unable to perform as expected by the Business Association, it would have a downstream impact on AvMed's relationships with current and potential clients in the small group market who are heavily involved with the Business Association. (Repp Decl. at ¶ 28). These harms are all inherently irreparable, as money damages cannot fix reputational harm or loss of goodwill.

Additionally, as stated in the Repp Decl., AvMed will also stand to incur substantial monetary harm that is also irreparable. Specifically, AvMed anticipates it would suffer at least approximately $90,000,000 in damages if it is unable to "go live" on its new enterprise system by

14

July 1, 2020. (*See, generally,* Repp Decl.). Though monetary harm is not generally considered irreparable harm, it is when the damages cannot be recovered. *Scott*, 561 U.S. at 1303 ("[n]ormally the mere payment of money is not considered irreparable… but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable."); *see also See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (concluding that monetary damages were irreparable because they could not be recovered against a state agency due to the agency's Eleventh Amendment immunity); *Bonds v. Heyman*, 950 F.Supp. 1202, 1215 n.15 (D.D.C. 1997) (considering the fact that the plaintiff's damages would be in excess of the statutory cap at issue in the case was a factor in finding monetary damages to be irreparable) *abrogated on other grounds*.

In this case, the MSA contains a limitation of damages provision and damages cap. MSA at §§ 18.1 and 18.2, respectively. These provisions operate to preclude AvMed from recovering incidental, indirect, consequential, special, exemplary, or punitive damages, as well as recovering for loss of revenue, income, profit, savings or share value, loss of goodwill or reputation. *Id.* It also limits the overall recovery available for NTT's breach of the MSA to the amount of service charges paid by AvMed to NTT in the preceding eighteen months. *Id.* Clearly, the monetary and non-monetary harm AvMed would suffer absent an injunction would be largely irreparable given AvMed may have no ability to recover all of its damages under the MSA. *Scott*, 561 U.S. at 1303.

Moreover, harm that affects the survivability of a company is irreparable, even if it could be assigned a monetary value. *Pizza Fusion Holdings, Inc. v. Burton Holdings LLC*, 14-62564-CV, 2015 WL 11197817, at *1 (S.D. Fla. Feb. 2, 2015) ("Notably, *impending loss or financial ruin* of business constitutes irreparable injury.") (citing *Ryko Mgf. Corp. v. Delta Servs., Inc.*, 625 F. Supp. 1247, 1248 (S.D. Iowa 1985)); *see also ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d

1272, 1309 (S.D. Fla. 2008) ("Numerous courts have recognized that irreparable harm may result from the loss of a central, key component of the business, even if the business as a whole is not destroyed immediately.").

As noted *supra*, the significant economic harm AvMed stands to incur if an injunction is not entered will raise serious questions regarding AvMed's ability to survive as a company. (Lonsdale Decl. at ¶ 18; Repp Decl. at ¶ 10). Even if that harm could be quantified into a definite amount of money damages, it is still irreparable for purposes of this Expedited Motion because of the devastating impact it will have on AvMed's current and planned operations, which in some instances would result in a complete loss of certain lines of business. (*Id.*).

In a similar situation, the Eleventh Circuit found a trial court did not abuse its discretion in granting preliminary relief for the reasons set forth by AvMed in this Expedited Motion. *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1163–64; 1165–66 (11th Cir. 2018), *cert. denied sub nom. Goldenberg v. Transcon. Gas Pipe Line Co.*, LLC, 139 S. Ct. 1634 (2019). Specifically, the movant in *Tanscon. Gas* sought a preliminary injunction on the basis that it would suffer non-economic harm in the form of reputation loss and loss of goodwill, as well as economic harm due to there being no means by which it could recover the substantial monetary harm it stood to lose if it was not allowed access to property by the predetermined date. *Id.*

In affirming the trial court's decision to enter a preliminary injunction, the Eleventh Circuit commented as follows:

> The district court concluded that Transcontinental would suffer irreparable economic and reputational harm absent an injunction. With respect to economic harm, the district court noted that the Dalton Expansion Project's project manager had stated in his declaration that, if construction were delayed or interrupted, Transcontinental would incur "irrecoverable costs of hundreds of thousands of dollars per day," particularly if it missed its in-service deadline. Because

Transcontinental had no remedy at law to recover any costs caused by delay, the district court concluded that these economic damages would be irreparable. With respect to reputational harm, the project manager declared that Transcontinental faced "a significant risk of damage to its reputation, competitive standing, and business goodwill" if it was unable to meet its contractual obligations to the Dalton Expansion Project's primary customers. Such injuries, the district court concluded, are generally considered to be irreparable.

*Id.*

Based on the above facts and law, the harm AvMed will suffer if an injunction is not entered is undeniably irreparable and can only be prevented through preliminary relief.

### C.    The Balance of Equities Weighs in Favor of Granting Preliminary Injunctive Relief.

"In determining whether to grant injunctive relief, the Court must also weigh the balance of harm between the parties." *Janney Montgomery Scott LLC v. Helman*, No. 05-61097-CIV, 2005 WL 8154585, at *11 (S.D. Fla. Dec. 7, 2005). In this case, the balance of equities weigh decidedly in favor of the Court granting the preliminary relief sought by AvMed. The harm AvMed will incur if an injunction is not entered is substantial, as detailed in Section IV(B), *supra*. It includes reputational harm and loss of goodwill, as well as economic harm that is so severe it threatens the survivability of multiple lines of business at AvMed and, potentially, AvMed as a whole. *Id.*

NTT, on the other hand, would not suffer any harm if the Court enters the preliminary injunction requested by AvMed. All AvMed has sought is an order requiring NTT to do what it already agreed to do under the MSA: continue working on the Stop Work Items in order to achieve a "go live" date of July 1, 2020. Since no additional harm could befall NTT if the preliminary injunction is entered, the equities weigh heavily in favor of granting AvMed's Expedited Motion. *See Travelers Cas. and Sur. Co.*, 2012 WL 4792906, at * 2 (holding a movant successfully

established the equities weighed in its favor by showing the injunction only sought to hold the opposing party to the terms of its contract, thereby eliminating any harm to the opposing party).[3]

Therefore, when weighed, the balance of equities tips sharply in favor of the Court entering the preliminary injunction requested by AvMed.

**D.      Granting AvMed Preliminary Injunctive Relief Would Not Be Adverse to the Public Interest.**

Courts, including those within this District, have recognized that the public interest favors enforcement of contracts. *See, e.g., Developers Sur.*, 2009 WL 3831437, at *2 ("[T]o the extent that the public has any interest in the instant proceedings, such interest would be in seeing that contractual agreements between parties are upheld" (emphasis removed)); *see also In re Jotan, Inc.*, 229 B.R. 218 (M.D. Fla. Bankr. 1998) ("The public is best served by enforcing valid contracts."). In this Expedited Motion, AvMed is seeking to enforce the plain language of the MSA—nothing more. AvMed must "go live" on the systems NTT promised it would deliver by July 1, 2020 to avoid irreparable harm, which will not be possible if NTT is not ordered to resume working as required under the MSA. *Id.*

The public interest will also be harmed if AvMed cannot participate in the marketplace due to NTT's failure to meet the "go live" date. AvMed would be precluded from offering its products to many Florida residents and businesses who rely on and need them. This would have a negative impact on the public, both directly as to the members who benefit from AvMed's products and indirectly as the beneficiaries of reduced prices due to increased competition. Therefore, it is in

---

[3] *See also Hanover Ins. Co. v. Holley Constr. Co. & Assocs., Inc.*, No. 4:11–CV–41 (CDL), 2012 WL 398135, at *6 (M.D.Ga. Feb. 7, 2012) ("Although Defendants may suffer harm as the result of the injunction, this harm is the result of enforcement of an Indemnity Agreement which Defendants entered; an injunction would only require Defendants to do that which they agreed to do."); *Int'l Fid. Ins. Co. v. Waterfront Grp. NC, LLC*, No. 3–11–cv–00116–W, 2011 WL 4715155, at *5 (W.D.N.C. Oct. 6, 2011) ("Granting the injunction would require Defendants to perform as they contractually-obligated themselves to do.").

the public interest that AvMed's Expedited Motion be granted, as to allow NTT to willfully neglect to perform its contractual duties would promote breaching a valid agreement.

> **E.      Security Considerations Under Fed. R. Civ. P. 65(a)**.

Courts are required to consider whether a bond or other form of security is required in order to protect a party subject to a preliminary injunction. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). However, the Court has broad discretion in determining whether a bond is required when issuing a preliminary injunction. *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D. Fla. 1998) ("federal courts have come to recognize that the district court possesses discretion over whether to require the posting of security.") (citing 42 Am. Jur. 2d, *Injunctions*, section 310).

In this case, the Court should dispense with the requirement for AvMed to provide security for the requested preliminary injunction. As discussed in Section IV(C), *supra*, NTT would not suffer harm if it were required to comply with the requested preliminary injunction and AvMed is already paying (and will continue to pay) NTT approximately $2.8 million each month to perform under the MSA. Given the lack of any injury to NTT, the Court should determine that no security is required. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964) ("the trial judge has wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary.").

To the extent the Court determines AvMed is required to post a bond in this case, the Court should reserve on the amount of any security until after the preliminary injunction has been entered. This is a customary practice in the Southern District of Florida and would not prejudice

NTT. *See Popular Bank of Florida*, 180 F.R.D. at 464-65 ("it is not unusual in the Southern District for the bond determination to be made after the issuance of a preliminary injunction.") (citing *Carillon Importers, Ltd. v. Frank Pesce Intern'l Group Ltd.*, 112 F.3d 1125 (11th Cir. 1997)).

     **F.**     **Expedited Relief is Appropriate in This Action.**

     To qualify for expedited treatment, AvMed must do the following: (i) include "Expedited Motion" in the title of its motion; (ii) identify a date by which a ruling is necessary; (iii) and detail the reasons a ruling is needed by the selected date. L.R. 7.1(d). In this case, AvMed has satisfied all of these requirements. The detailed reasons for an expedited ruling are exhaustively outlined above and in the Lonsdale Decl. and Repp Decl. In short, NTT has informed AvMed that, though it has temporarily resumed work to frustrate AvMed's efforts to file an emergency motion, NTT will once again cease working on the Stop Work Items by May 15, 2020 if AvMed does not succumb to NTT's extra-contractual demands. AvMed will be irreparably harmed by NTT's refusal to continue performing under the parties' MSA because NTT will be unable to meet the "go live" date for AvMed's new enterprise systems of July 1, 2020. (Lonsdale Decl. at ¶ 49; Repp Decl. at ¶ 8). As such, AvMed respectfully submits that it needs the Court to rule on this Expedited Motion by May 12, 2020 in order to avoid the irreparable harm outlined in Section IV(B), *surpa*.

## V.  <u>Conclusion</u>

     For the above reasons, the Court should grant AvMed's request for an expedited preliminary injunction against NTT.

     WHEREFORE, AvMed respectfully requests the Court enter an Order granting AvMed's Expedited Motion for Preliminary Injunctive Relief, require NTT to continue working on the Stop Work Items and all other initiatives outlined in the MSA through the July 1, 2020 "go live" date, and for such further relief as the Court deems just and proper.

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ Christina M. Schwing
Jose Casal
Florida Bar No. 767522
Jose.casal@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Phone: (305) 374-8500
Facsimile: (305) 679-6350

Christina M. Schwing
Florida Bar No. 11420
chris.schwing@hklaw.com
Derek K. Mountford
Florida Bar No. 127172
derek.mountford@hklaw.com
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Phone: (904) 353-2000
Facsimile: (904) 358-1872

*Counsel for Plaintiff, AvMed, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of May, 2020, a true and correct copy of the foregoing was served on counsel for the Defendant via email to the following:

Glenn A. Weiner, Esq.,
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
GWeiner@klehr.com

/s/ Christina M. Schwing
Attorney

21

#74390835_v2